*Town of Bel Air, Maryland, et al. v. Barton Bodt, et al.*, No. 27, September Term, 2023, Opinion by Booth, J.


**MUNICIPAL PETITION FOR REFERENDUM OF A ZONING REGULATION.**
The legal sufficiency of a petition for referendum of a municipal ordinance related to a comprehensive rezoning is a matter that arises solely under the municipal charter. Md. Code Ann., Local Government Article § 5-213 (2013 Repl. Vol., 2023 Supp.). Under the plain and unambiguous language of the Charter for the Town of Bel Air ("Charter"), the Board of Commissioners ("Commissioners") had the authority to make a threshold determination as to whether the text of the purported petition satisfied the requirements of the Charter prior to sending it to the Board of Election Judges ("Election Board"). The Commissioners did not err in determining that the document did not satisfy the requirements of the Charter and was therefore invalid. Moreover, under the provisions of the Charter, the Commissioners were authorized to make this determination by a verbal motion adopted by a vote of the Commissioners and memorialized in the minutes of the Commissioners' proceedings. Given that the document did not constitute a valid "petition for referendum" under the Charter, the Commissioners were not required to submit it to the Election Board for verification of signatures. Accordingly, the plaintiff-citizens were not entitled to a writ of mandamus or the permanent injunctive relief sought in the amended complaint.

Circuit Court for Harford County
Case No.: C-12-CV-22-000799
Argued: March 1, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 27

September Term, 2023

TOWN OF BEL AIR, MARYLAND, ET AL.

v.

BARTON BODT, ET AL.

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Getty, Joseph M.
  (Senior Justice, Specially Assigned)

JJ.

Opinion by Booth, J.

Filed: July 9, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

In Maryland, a municipal local government must exercise its authority to undertake particular action in accordance with controlling law. Sometimes, the controlling law is a statute in which the General Assembly directs that a particular municipal action be undertaken in a specific manner. In other instances, the General Assembly may simply authorize the municipality to act in accordance with the authority granted by its municipal charter. Applying these principles in this case, we are asked to determine whether the Board of Commissioners of the Town of Bel Air (the "Commissioners") correctly determined that a document submitted by citizens in connection with a comprehensive rezoning was invalid, and therefore did not err when it declined to take further action on it.

Citizens submitted a purported petition for referendum to the Town of Bel Air (the "Town"). Thereafter, the Commissioners considered the document at a meeting, and determined that the text of the purported petition for referendum did not comply with the requirements of the Town of Bel Air Charter (the "Charter"). As a result, the Commissioners did not send it to the Town Board of Election Judges ("Election Board") for verification of signatures. Barton Bodt and other town residents (hereinafter collectively referred to as "Bodt")[1] filed a complaint against the Town in the Circuit Court for Harford County seeking a declaratory judgment under the Courts and Judicial Proceedings Article of the Maryland Code ("CJ") § 3-406, a common law writ of mandamus, and permanent injunctive relief.

---

[1] The second amended complaint, which is the operative complaint, identifies the following plaintiffs: Barton Bodt and Mary F. Towers, Terence and Debra Hanley, Steven and Karen Chizmar, Patrick and Laurie Wallis, Robert Hruz, Vincent and Pam McHugh, Evan Schaule, and Cindy Ryback.

After considering the Town's and an intervenor's motion for summary judgment, the circuit court entered a declaratory judgment declaring, in pertinent part, that the Commissioners' determination was invalid. The circuit court entered a separate order, among other things, directing the Town to verify the signatures on the document.

We granted *certiorari* to determine whether the Commissioners correctly determined that the purported petition was invalid. For the reasons set forth more fully herein, we hold that the Commissioners did not err. We vacate the circuit court's judgment and remand this case to the circuit court for the entry of a declaratory judgment in conformance with this opinion.

# I

## Factual Background

### A.    Comprehensive Rezoning – Adoption of Ordinance 809-22

The Town, by its Commissioners, adopted an updated comprehensive plan[2] in March 2022. Thereafter, the Town initiated a comprehensive rezoning process. As part of that process, the Commissioners introduced Ordinance 809-22, which amended the Town's official zoning map by reclassifying 13 properties. Prior to the adoption of Ordinance

---

[2] In Maryland, the local legislative body of a municipal corporation with planning and zoning authority is required to adopt a "comprehensive plan" by legislative act. Md. Code Ann., Land Use Article ("LU") § 3-101 (2012 Repl. Vol., 2023 Supp.). "A comprehensive plan generally applies to a substantial area and is the product of years of long study and public input." *Dzurec v. Bd. of County Comm'rs of Calvert County*, 482 Md. 544, 553 (2023) (citations omitted). Once it is adopted, the local jurisdiction may then adopt zoning, development, and subdivision regulations to implement the plan. LU § 3-303(b). The local jurisdiction is required to review its comprehensive plan at least once every 10 years and revise or amend it as necessary. LU § 3-301.

809-22, the Town's Planning Commission recommended the comprehensive rezoning, the ordinance was subject to a public hearing, and the Commissioners made certain findings, including that the proposed zoning was consistent with the newly adopted comprehensive plan. Ordinance 809-22 was adopted on May 2, 2022, and had an effective date of May 23, 2022.

The Klein Family[3] owns the five properties that are the subject of this dispute. Three of the five properties are located on East Broadway, and two are on East Gordon Street. All five properties were rezoned to the B-3 (General Business) District. Prior to the comprehensive rezoning, the properties located on East Gordon Street were zoned in the B-2 (Business Central) District, and those on East Broadway were zoned in the R-2 (Medium Density Residential) District.[4]

---

[3] The five properties that are the subject of this dispute are owned by Colgate Investments, LLC and Klein Family Development Corporation, which are entities operated by the Klein family. For ease of reference, we will collectively refer to these entities as "the Klein Family" or "Klein"—in the same manner that the parties refer to the ownership interests in their briefs.

[4] In connection with the comprehensive rezoning, the Klein Family submitted a "Justification Statement" to the Town, which was included in Exhibit A to Ordinance 809-22. In the Justification Statement, the Klein Family explained that they own an existing shopping center "which has been the home to Klein's Shoprite . . . since the 1980's." The Kleins sought a rezoning of adjacent properties located on Gordon Street and East Broadway to B3-A in order to accommodate future growth and expansion of Klein's Shoprite.

### B.     *Efforts to Initiate a Referendum*

On May 23, 2022, Bodt submitted a stack of signature pages to the Town office that was intended to constitute a petition for referendum.  In total, the document contained 1,051 signatures.  The top of each signature page contained the following language:

> My signature on this document records my disapproval of the change of zoning from residential (R-2) to business (B-3A) for the following properties in Bel Air MD: 45, 53 and 57 East Broadway and 38 and 44 Gordon Street.
>
> We request the decision be reversed and the properties returned to R-2 zoning.

The document neither contained any reference to Ordinance 809-22, nor did it request that the Ordinance be submitted to a referendum vote in a Town election.  It also contained an error—two of the described properties were not zoned in the R-2 (Medium Residential Density) District, but rather had been zoned in the B-2A (Business Central) District.

The Election Board considered the purported petition at a meeting on May 25.  During that meeting, the Town attorney informed the Election Board of his belief that the document did not constitute a valid petition for referendum under the Charter.  Based on the advice of counsel, the Election Board declared that the document did not comply with the Charter, and thus did not constitute a valid petition for referendum.  The Election Board did not seek to verify that the signatures on the document were from registered voters.

On June 10, Bodt refiled the same document that had been submitted on May 23, as well as new pages containing 926 additional signatures.  In an attempt to address the concerns raised by the Town attorney at the Election Board meeting, Bodt added a cover page, which stated as follows:

4

**Petition for Referendum**
**Ordinance 809-22**

> The undersigned persons hereby request, pursuant to section 504 of the Town Charter, that Ordinance 809-22 (as it relates to the properties at 45, 53 and 57 E. Broadway and 38 and 44 Gordon Street) be submitted for referendum to the voters of the Town of Bel Air.

However, the language at the top of each signature page remained unchanged from the May 23 filing, including incorrectly referencing two of the five properties as having a residential zoning classification prior to the comprehensive rezoning.

### C.      Town Commissioners' Consideration of the Purported Petition

The Commissioners considered the purported petition at their regularly scheduled meeting on June 21.  The minutes of that meeting reflect that the Commissioners undertook a detailed discussion of the document and whether it complied with the requirements of the Charter.

At the outset of the discussion, a motion was made, and seconded, to declare "that the signatory documents submitted to the Town" on June 10 "do not constitute a petition for referendum and therefore are legally insufficient and invalid to be considered for scheduling a referendum on Ordinance 809-22."

The Town's Director of Administration gave an overview of the Town's comprehensive rezoning process that culminated in the adoption of Ordinance 809-22.  The Director recited the provisions of Section 504 of the Charter that govern petitions for referenda.  Thereafter, the Town attorney expressed his view that the document did not constitute a valid petition for referendum under the Charter and touched upon several deficiencies.  He noted that the language at the top of each signature page was factually

5

inaccurate because it reflected that the newly rezoned properties on East Broadway were previously zoned in a residential district, when they had, in fact, been designated in a commercial one. He explained that Section 504 requires that a referendum petition request that an ordinance be submitted to the voters of the Town. The attorney pointed out that the signature pages did not mention the ordinance or request a referendum on the ordinance, but instead, sought a zoning reclassification of five of 13 properties. The Town attorney's view was that the document did not comply with the requirements set forth in the Charter to be considered a "petition for referendum," and, therefore, Ordinance 809-22 became effective on May 23, 2022.

The Commissioners then discussed the purported petition. One Commissioner noted that the "circulated signature sheets ma[d]e no mention" of words such as "petition," "referendum," or "vote." She observed that, based on the language in the document, citizens "would have no idea that they were signing a document calling for a town-wide vote on the issue," as the language simply called for the reversal of a zoning decision. She pointed out that "the Town Charter is clear that any petition for a referendum should include" a reference to the ordinance number that is the subject of the petition, and also "incorporate language communicating" that, by signing the document, the signatories "are requesting that the ordinance be put to a public vote in a town election." She also observed that the "last minute cover sheet" prepared by the circulators' attorney was not seen by the citizens prior to them signing the document. Other Commissioners agreed, observing that the deficiencies in the purported petition were not simply legal technicalities insufficient to declare the petition invalid.

6

At the conclusion of the discussion, the Chairperson called for the vote on the pending motion. The motion carried by a vote of 4-1.[5]

### D.    *Proceedings in the Circuit Court*

Bodt filed a complaint against the Town in the Circuit Court for Harford County in November 2022. The second amended complaint is the operative complaint and includes three counts. In Count I, Bodt seeks a declaratory judgment pursuant to CJ § 3-406, declaring that, among other things:

- The purported petition complied with Section 504 of the Town Charter "in all respects."

- The Commissioners' determination that the document did not constitute a valid petition for referendum was legally incorrect and invalid.

- Because the purported petition contained more than 20% of the qualified voters, the Commissioners had no authority to declare it to be legally insufficient or invalid.

- Because the purported petition contained the requisite number of signatures and was filed in the appropriate time frame, Ordinance 809-22 did not become effective.

- The Town is prohibited from taking any further action pursuant to Ordinance 809-22 unless and until the Commissioners and the Election Board perform their duties under Section 504 of the Charter.

Count II seeks a common law writ of mandamus compelling the Commissioners to: (1) direct the Election Board to verify the signatures on the document; and if the Election

---

[5] Thereafter, this matter took an unnecessary procedural detour that has no relevance to our consideration of the issues presented here. We mention it briefly for completeness. Under Charter § 503(d), any person who is aggrieved by a decision of the Election Board may appeal the decision to the Commissioners. Pursuant to this section, the citizens noted an appeal of the Election Board's May 25 decision to the Commissioners. They argued that the Election Board lacked the authority to decide whether the petition was valid because the Commissioners are the legislative body authorized to make that determination. The Commissioners agreed, and there does not appear to be any dispute on that point.

Board confirms that at least 20% of the signatories are registered voters in the Town election, and (2) pass a resolution specifying the date and hours for a Town election on the petition. Count III seeks a permanent injunction enjoining the Town from, among other things, "taking any further action pursuant to Ordinance 809-22 as it relates to the properties that are the subject" of the petition unless and until the Commissioners and Election Board "perform their duties" under Section 504, including holding an election (after verification of signatures), and the "results of the election" "are known."

The Klein Family moved to intervene. The Town and the Klein Family each filed a motion to dismiss, or alternatively, for summary judgment. After Bodt filed a response, the court scheduled a hearing on the motions. Thereafter, the circuit court issued a memorandum opinion and order, which declared the rights of the parties.

The court determined that there were no disputes of material fact. After reviewing the minutes of the June 21 Commissioners' meeting, the court stated that it was "clear" that the Commissioners "by oral motion declared that the documents submitted" to the Town "did not constitute a valid or legally sufficient petition for referendum in order to proceed with a referendum. In short, the legislative body denied a referendum by oral motion." The court concluded that the Commissioners' determination concerning the validity of the purported petition was invalid for two reasons. *First*, the court found that the Commissioners were required to submit the document to the Election Board for verification of signatures *prior to* making any determination that the document did not otherwise satisfy the requirements for a valid referendum petition under the Charter. *Second*, the court ruled that the Commissioners were required to act on this matter by the adoption of an "ordinance

8

or arguably, a resolution." Because the Commissioners acted by "verbal motion," the court determined that the Commissioners' action "was ultra vires and of no legal force and effect." The court entered a declaratory judgment consistent with these findings. Among other things, the court declared that Bodt was entitled to have the Election Board verify the signatures and that "Maryland common law require[d]" that the signature verification be "completed before determining the validity of the petition itself."

The court entered a separate order dated July 21, 2023, ruling that Ordinance 809-22 was not currently effective. The court directed the Town to take the following action with respect to Bodt's petition:

- To verify the signatures and count the number of registered voters who signed the petition within 45 days of the date of the order.

- To report the results of the signature verification at the Commissioners' next regularly scheduled meeting following the verification and counting of signatures.

- Within 30 days "after public presentation of the" "results of the count" to proceed by "resolution or ordinance to grant or deny the referendum."

In its accompanying memorandum, the court ruled that the Commissioners could "not make use of a mere oral motion" because, "under Maryland law," any such Commissioner action "is required to proceed by ordinance or arguably by resolution." The court also stated that its order constituted a "final order in the case," determining that there "are currently no further matters before the [c]ourt to consider."[6]

---

[6] Although the circuit court did not specifically mention Bodt's mandamus or injunction counts in its final order, that order did in fact partially grant the relief he sought in those counts.

9

No party was satisfied with the declaratory judgment and order entered by the circuit court. The Town and Klein Family each filed a notice of appeal, and Bodt filed a cross-appeal. Prior to the Appellate Court's consideration of this case, the Town filed a petition for writ of *certiorari*, which we granted to consider the following questions, which we have condensed and rephrased:[7]

> 1.     Did the Commissioners correctly determine "that the signatory documents submitted to the Town" did "not constitute a petition for referendum" under the provisions of Section 504 of the Town Charter, and were therefore "legally insufficient and invalid to be considered for scheduling a referendum on Ordinance 809-22"?
>
> 2.     Were the Commissioners permitted to make the determination set forth in question 1 by a verbal motion at a Commissioners' meeting that was memorialized in the minutes of the meeting?

We answer yes to both questions. We therefore vacate the judgment of the circuit court and remand the case with instructions to enter a declaratory judgment consistent with this opinion.

## II

## Standard of Review

The circuit court entered its declaratory judgment on the basis of a motion for summary judgment. A case may be resolved on summary judgment when there is no dispute of material fact, and the moving party is entitled to judgment as a matter of law.

---

[7] In addition to these questions, the petition for writ of *certiorari* also requested that we address whether organizers of a petition for referendum are prohibited from altering the language of a petition after they have obtained signatures in support of the petition. Given our resolution of the two questions that we are addressing here, we do not need to address that question.

10

Md. Rule 2-501(f).  There is general agreement in this case that no material facts are in dispute and that the issues before us are purely legal, namely, whether the Commissioners correctly determined that the purported petition for referendum did not comply with the provisions of the Charter, and whether they were authorized to make such a determination by verbal motion.  These are questions that we consider de novo and without any deference to the circuit court's conclusions.  *See, e.g.*, *Bennett v. Harford County*, 485 Md. 461, 473 (2023) (explaining that the interpretation of a charter is a legal question, which we review without deference).  Where the circuit court does not enter a proper declaratory judgment, "[t]his Court, in its discretion, may 'review the merits of the controversy and remand for entry of an appropriate declaratory judgment by the circuit court.'"  *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 256 (2009) (quoting *Bushey v. N. Assurance Co. of Am.*, 362 Md. 626, 651 (2001)).

### III

### Discussion

### A.    *Municipal Referendum on a Zoning Ordinance—All Roads Lead to the Municipal Charter*

In this case, we are asked to consider whether the local legislative body of a municipality correctly construed the applicable provisions of its charter pertaining to a purported petition for referendum, and if so, whether it exercised its authority to determine the validity of the purported petition in a lawful manner.  As we recently observed, when

11

considering the correctness of a municipal legislative body's action,[8] it is important to consider: (1) the substance of the municipal action in question, (2) the source of the municipality's authority to undertake the action, and (3) the manner in which the action was undertaken because "municipalities possess only such powers as have been conferred upon them by the Legislature." *K. Hovnanian Homes of Md., LLC v. Mayor of Havre de Grace*, 472 Md. 267, 288 (2021) (quoting *River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 543 (2007)); *see also Hardy v. Hous. Mgmt., Co.,* 293 Md. 394, 396 (1982) (noting that "[i]t is well established under our decisions that a municipal corporation has but limited authority"); *Birge v. Town of Easton*, 274 Md. 635, 639 (1975) (explaining that a "municipal corporation[] possesses only limited powers").

---

[8] In Maryland, municipalities derive their authority from the Municipal Home Rule Amendment, Article XI-E of the Constitution of Maryland, which was ratified by the citizens of Maryland on November 2, 1954. Under the Home Rule Amendment, Article XI-E, § 3, the legislative body of a municipality may adopt, amend, or repeal its charter, consistent with the authority granted by the Maryland Constitution and the express powers conferred by the General Assembly.

The Home Rule Amendment was implemented by former Maryland Code Article 23A (1957). Former Article 23A, § 1 gave municipal corporations general authority "to pass and adopt all ordinances, resolutions or bylaws necessary or proper to exercise the powers granted herein or elsewhere." In addition to this general authority, the General Assembly enumerated a list of "express ordinance-making powers" ranging in subject matter. *See* former Article 23A, § 2.

In 2013, Article 23A was repealed and its provisions were re-codified in a new article of the Maryland Code designated as the "Local Government Article." 2013 Md. Laws 584–2120. The express ordinance-making powers formerly described in Article 23A, § 2 are now codified in Local Government Article ("LG") Title 5, Subtitle 2 titled "Enumeration of Express Law Making Powers."

Here, we are reviewing the Commissioners' consideration of a purported petition for referendum pertaining to a zoning ordinance. The General Assembly has expressly provided that the adoption of a zoning regulation—such as a comprehensive rezoning—is subject to a right of referendum as may be provided by the municipal charter. *See* Md. Code Ann., Local Government Article ("LG") § 5-213 (2013 Repl. Vol., 2023 Supp.) (stating that "[a] municipality may adopt zoning regulations, *subject to any right of referendum of the voters at a regular or special election as may be provided by the municipal charter*" (emphasis added)).

A citizen's right to petition for referendum of a municipal zoning regulation is a right that arises solely under the municipal charter. Other types of municipal referendum petitions are governed by state statutes, and in such instances, any applicable charter provisions must be construed consistently with the statutory directives. For example, the General Assembly has provided certain statutory rights and associated procedures that govern municipal annexation referenda, *see* LG §§ 4-409 through 4-413, and municipal referenda on charter amendments, *see* LG §§ 4-304, 4-305, 4-307. It is also notable that, unlike state or county petitions for referendum, municipal petitions for referendum are not governed by the statutory requirements that apply to referendum petitions generally. *See* Md. Code Ann., Election Law Article ("EL") § 6-102(b) (2013 Repl. Vol., 2023 Supp.) (excluding petitions for referendum applicable to municipalities from the petition requirements and procedures contained in Title 6 of the Election Law Article); *see also*

13

*id.* § 1-101(v)(3) (excluding municipal elections generally (other than Baltimore City) from the provisions of the Election Law Article unless otherwise stated).[9]

In contrast to other types of petitions arising from statutory rights of referendum, the right of the qualified voters of a municipality to file a petition for referendum of a zoning ordinance arises entirely under the municipal charter.[10] Having identified the nature of the action being undertaken by the Commissioners, we turn to whether they correctly construed the provisions of their Charter.

### B.  Bel Air Charter

We interpret the provisions of a charter using the same canons of construction that we use to interpret statutory language. *See, e.g.*, *Bennett*, 485 Md. at 484; *Prince George's County v. Thurston,* 479 Md. 575, 586 (2022). "To discern legislative intent, we first assign the words of the charter provision their 'ordinary and natural meaning.'" *Thurston*, 479

---

[9] Although municipal elections are not generally subject to the provisions of the Election Law Article ("EL"), there are some provisions that may apply. For example, after a municipal election "in which a referendum vote is held on a law, ordinance, or resolution," the municipality is required to report the results to the clerk of the court for the county, who, in turn, is required to certify the results of the referendum to the State Board of Elections. EL § 11-605.

[10] The circuit court relied on *Gray v. Howard County Board of Elections*, 218 Md. App. 654 (2014), in ruling that the Commissioners were required to send the purported petition to the Election Board for verification of signatures prior to making a threshold determination as to whether it satisfied the other requirements of the Charter. *Gray* has no application in this case. *Gray* involved the validity of a referendum petition filed in a charter county that was subject to the statutory requirements set forth in the Election Law Article that apply to county petitions, and the sequence enumerated in that statute for verifying petitions. 218 Md. App. at 662–64. As discussed above, the statutory provisions that govern referendum petitions set forth in the Election Law Article do not apply to municipal petitions regarding zoning ordinances.

14

Md. at 586–87 (quoting *120 W. Fayette St., LLLP v. Mayor & City Council of Baltimore City*, 413 Md. 309, 331 (2010)). We "will not divine a legislative intention contrary to the plain language of the charter provision or judicially insert language to impose exceptions, limitations, or restrictions not evident in the plain language." *Id.* at 587 (cleaned up); *see also Lockshin v. Semsker*, 412 Md. 257, 275 (2010) ("We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." (cleaned up)). If the language "is unambiguous and clearly consistent with the" charter provision's "apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the" charter provision "as written, without resorting to other rules of construction." *Bennett*, 485 Md. at 485. As discussed below, we determine that the provisions pertaining to petitions for referendum in the Charter are plain, clear, and unambiguous. Accordingly, we need not discuss other canons that we routinely utilize when we reach a contrary result.

     1.     *The Plain Language of Section 504(b) Does Not Require that Signatures be Verified Prior to Ascertaining Whether the Petition is Facially Valid*

Section 308(c)[11] of the Charter provides that "[a] newly enacted ordinance may be subjected to referendum in accordance with the provisions of Section 504 of this Charter."

---

[11] The Charter does not use parenthesis when referring to its subsections. For readability, when discussing these provisions, we have added parenthesis around subsection letters and numbers.

15

Section 504(a)–(c) sets forth the procedures and requirements applicable to petitions for referendum of town ordinances.[12] Subsection (a) provides the parameters and requirements

[12] The entirety of Section 504 states:

Wherever the right of referendum is provided in this Charter it shall be exercised in accordance with the following procedures:

a. No resolution subject to referendum shall become effective at any time before forty-one days from date of its passage and the effect of any ordinance subject to referendum may be suspended if petitioned to referendum at any time during the forty[-]day period following its enactment. No ordinance shall become effective if a petition for referendum requesting that the ordinance or proposed resolution or Charter amendment subject to referendum be submitted to the voters of the Town, signed by ten percent (10%) or more of the persons who are qualified to vote in the Town elections, be received by the twentieth (20th) day following the passage of the ordinance or proposed resolution or Charter amendment. In order to initiate a referendum a petition for referendum meeting the requirements of subsection (b) must be presented to the Board of Commissioners within, on or before the fortieth day after a resolution or an ordinance is passed.

b. A petition for referendum shall be signed by twenty percent (20%) or more of the persons who are qualified to vote in Town elections and shall request that the ordinance or proposed resolution or Charter amendment subject to referendum be submitted to the voters of the Town. Each person signing the petition shall indicate thereon both their name and residence address. Upon receiving a petition for referendum, the Board of Commissioners shall direct that the Board of Election Judges or its appointed agent verify that all persons who circulated and/or signed the petition are registered to vote in Town elections, and shall consider the petition as of no effect if it is signed by fewer than twenty percent (20%) of the persons who are registered to vote in the Town.

c. If the petition for referendum complies with the requirements of subsection (b), the Board of Commissioners shall by ordinary resolution specify the day and the hours of the election at which the question shall be submitted to the voters at a regular Town election or at a special election in the discretion of the Board. In the event a special election is designated, it shall be held within a period of not less than forty-five (45) days nor more than sixty (60) days after the passage of the resolution, providing for the referendum. The

for suspending the effective date of an ordinance that has been petitioned to referendum. Subsection (b) sets forth the substantive requirements that a document must satisfy in order to be considered a valid petition for referendum. Subsection (c) sets forth the election procedures that the Commissioners must follow "[i]f the petition for referendum complies with the requirements of subsection (b)[.]"

Bodt contends that the circuit court correctly determined that the Commissioners could not make a preliminary determination as to whether the text of the purported petition satisfied the requirements of subsection (b) without first sending it to the Election Board for verification of signatures. We disagree.

Subsection (b) states:

A petition for referendum shall be signed by twenty percent (20%) or more of the persons who are qualified to vote in Town elections and shall request that the ordinance or proposed resolution or Charter amendment subject to referendum be submitted to the voters of the Town. Each person signing the petition shall indicate thereon both their name and residence address. Upon receiving a petition for referendum, the Board of Commissioners shall direct that the Board of Election Judges or its appointed agent verify that all persons who circulated and/or signed the petition are registered to vote in Town elections, and shall consider the petition as of no effect if it is signed by fewer than twenty percent (20%) of the persons who are registered to vote in the Town.

Under the plain language of the first sentence, there are two conditions for a "petition for referendum" to be valid: (1) that it be signed by 20% or more of the persons who are qualified to vote in town elections; and (2) that it "shall request that the ordinance

_____

resolution providing for the referendum shall specify the exact wording which is to be placed on the ballots or voting machines when the question is submitted to the voters of the Town.

17

. . . subject to referendum be submitted to the voters of the Town." The determination of whether each requirement is satisfied is made by two separate boards. The Commissioners, as the legislative body of the Town, determine whether the petition satisfies the general facial or textual requirements of Section 504(b). The Election Board, or its designee, verifies that the signature requirement is satisfied. If the petition for referendum satisfies both conditions, the Commissioners are required, "by ordinary resolution," to schedule an election at which the question is submitted to the Town's voters. Charter § 504(c).

The text of the Charter does not contain any words that require a particular order or sequence when determining whether a petition complies with the provisions of Section 504(b). Nor does the fact that the two conditions are separated by the conjunctive word "and" signify an order or sequence of events that the Commissioners must follow when they receive a purported petition. The word "and" is commonly used to express or indicate that one or more conditions must occur, each having separate and equal rank and function. *And*, Merriam-Webster (11th ed. 2020) (defining "and" in the conjunction form as: "used as a function word to indicate connection or addition especially of items within the same class or type; used to join sentence elements of the same grammatical rank or function").

Bodt asserts that the structure of the third sentence in subsection (b), stating that "[*u*]*pon receiving* a petition for referendum, the . . . Commissioners *shall direct* the [Election] Board or its designated agent" to undertake the signature verification, mandates that the Commissioners send the petition to the Election Board to undertake the signature verification process before undertaking any other action. (Emphasis added). We disagree with this interpretation. That sentence requires that the Commissioners send a "*petition for*

18

*referendum*" to the Election Board for verification. Charter § 504(b) (emphasis added).

As discussed above, to constitute a petition for referendum, the document must do more than contain the requisite number of signatures—it must also "request that the ordinance . . . subject to referendum be submitted to the voters of the Town." *Id.* Stated another way, not every document that the Commissioners receive bearing signatures is a "petition for referendum" satisfying the requirements of subsection (b)—a point that Bodt appeared to concede at oral argument.[13] There is nothing in the plain language of the Charter provision, or in its structure, to reflect that the Commissioners must send every document that they receive containing signatures to the Election Board prior to making a threshold determination that the document contains the basic information necessary to be considered a petition for referendum.

We determine that the language of Section 504(b) is plain and unambiguous. It requires that the petition satisfy two independent conditions, but it does not specify an order in which each body determines whether the condition within its sole purview has been satisfied. Specifically, the Commissioners may make a threshold determination as to whether a document contains the language required by subsection (b) to constitute a valid petition for referendum prior to sending the document to the Election Board for verification of signatures. Likewise, the Commissioners could have also forwarded the purported

---

[13] In questioning from the Court, Bodt's counsel acknowledged that if a document was submitted to the Town containing the signatures of the Town's qualified voters requesting that a designated date be deemed to be Town "hot dog day," the Commissioners would have the ability to make a threshold determination as to whether the document satisfied the requirements of Section 504(b) prior to sending it to the Election Board for signature verification.

19

petition to the Election Board for verification of signatures prior to determining whether it was facially valid.[14] Accordingly, we hold that the Commissioners did not err in making an initial determination that the purported petition did not satisfy the requirements of the charter.

    2.    *The Commissioners Did Not Err in Determining that the Document Failed to Satisfy the Requirements Necessary to be Considered a Petition for Referendum*

We also conclude that the Commissioners did not err in determining, as they expressed in their motion adopted on June 21, "that the signatory documents submitted to the Town" did "not constitute a petition for referendum" under the provisions of Section 504 of the Town Charter and were therefore "legally insufficient and invalid to be considered for scheduling a referendum on Ordinance 809-22."

Section 504(b) clearly provides that, in order to constitute a valid petition for referendum, the document "shall request that the ordinance . . . subject to referendum be submitted to the voters of the Town." As one of the Commissioners correctly pointed out at the June 21 meeting, the "circulated signature sheets ma[d]e no mention" of words such as "petition," "referendum," or "vote." She observed that, based on the language in the

---

[14] Our interpretation of the plain and unambiguous language—which does not dictate a sequence but permits an initial determination of either condition—makes sense. There may be situations in which it is plainly clear that a petition does not satisfy the requirements of Section 504 and it is more logical to make that determination prior to having the Election Board verify signatures. In other situations, it may be less clear that the petition is deficient, and thus it may make more sense to send the petition to the Election Board to verify the signatures first. If the signatures fall short, the more difficult issue of determining the sufficiency of a close case is avoided. The plain language of Section 504 permits consideration of the validity of the petition in either order.

20

document, citizens "would have no idea that they were signing a document calling for a town-wide vote on the issue." The information provided on the signature pages simply called for the reversal of a zoning decision, without identifying the mechanism for reversal.

Examining the document on its face, the petition does not satisfy the requirements of subsection (b). The signatory pages made no reference to an ordinance, nor did they request that an ordinance be submitted to a referendum. We further determine that the cover page that was affixed to the document as part of the June refiling did not cure the deficiency. While the newly added cover page purported to address some of the deficiencies—insofar as it contained a specific reference to Ordinance 809-22 and mentioned a "referendum" by the "voters of the Town"—it still failed to satisfy the requirements of Section 504(b). Specifically, the cover page requested that "Ordinance 809-22 (*as it relates to the properties* at 45, 53 and 57 E. Broadway and 38 and 44 Gordon Street) *be submitted for referendum* to the voters of the Town of Bel Air." (Emphasis added). This language makes clear that Bodt sought a referendum on *part* of an ordinance, not its entirety—a fact confirmed by his counsel during oral arguments.

The Commissioners argue that the plain language of the Charter does not grant a right of referendum on a *part* of an ordinance. We agree. The Charter contains numerous references to the right of referendum applying to "an ordinance" or "the ordinance." *See* Charter §§ 308(c), 504. The language in the Charter clearly specifies that the right of referendum applies to an ordinance in its entirety, and not to part of one. If the framers of the Charter intended to include a right to file a petition for referendum of *part* of an

21

ordinance, they could have done so.[15]  Indeed, the Charter could be amended to provide that right in the future.  That said, we interpret the plain language of the Charter as written, and do not judicially insert language that does not exist.  Accordingly, we hold that the plain language of the Charter does not provide for a right of referendum of *part* of an ordinance.  Assuming, without deciding,[16] that the cover page addressed the deficiencies contained in the initial submission, we determine that the submission was still deficient because what Bodt is seeking is *not* a referendum of Ordinance 809-22, but rather only of *parts* of it.  The Charter does not provide such a right.

### 3. The Verbal Motion of the Commissioners at Their Meeting, Memorialized in the Town Minutes, Was Sufficient

Having concluded that the Commissioners correctly determined "that the signatory documents submitted to the Town" did "not constitute a petition for referendum" under

---

[15] In their brief, the Commissioners point out that other charters in other jurisdictions expressly provide a right of referendum of an ordinance or part of one.  *See, e.g.*, City of Aberdeen, Md. Charter (2010, as amended), Chapter C §§ V(11)(a)–(e) (referring in several instances to an "ordinance or *part thereof* requested for referendum" when laying out the procedures (emphasis added)); Town of Ocean City, Md. Charter (1965, as amended) (Part I, Title IV, § C-411) (stating that the petition may request that "the ordinance, *or any part thereof*, be submitted to a vote of the registered voters of the town for their approval or disapproval") (emphasis added).  Likewise, by way of comparison, LG § 9-205(a)(2)(ii) requires charter counties to specify "whether a part of a local law may be petitioned to referendum."

[16] Because we conclude that the cover page submittal did not cure the petition's deficiencies, we do not need to decide whether other asserted deficiencies rendered the petition invalid.  These asserted deficiencies include: (1) that the document included material misstatements of fact concerning the prior zoning classification of some of the properties; (2) that the cover page was added after the signatures were collected and there is nothing in the record to indicate that previous signers saw it; and (3) whether adding a cover page (in lieu of a statement on the top of each signature page conveying the information) was sufficient to cure the deficiency.

Section 504 of the Town Charter, and were therefore "legally insufficient and invalid," we address the second question presented.[17] That is, whether the Commissioners were permitted to make the determination by a verbal motion at a regular meeting that was memorialized in the minutes of the official proceeding. We hold that the verbal motion was proper.

In ruling that the Commissioners were not authorized to determine the validity of the petition for referendum here by "mere oral motion," and that they were instead required to make this determination by adopting an "ordinance or arguably by resolution[,]" the circuit court relied upon our recent discussion of municipal authority in *Hovnanian*, 472 Md. at 306. We explain below why the Commissioners were not required to undertake more formal action than a verbal motion that was approved and memorialized in the minutes of the proceedings, and why our case law does not compel a different result.

Where the General Assembly specifies the manner in which a municipal legislative body must undertake particular action, the local legislative body must act in accordance with the statutory directive, or the action will be determined to be invalid and unenforceable. *Hovnanian*, 472 Md. at 306; *see also Inlet Assocs. v. Assateague House Condo. Ass'n*, 313 Md. 413, 429–30 (1988); *Twigg*, 396 Md. at 543; 5 Eugene McQuillin, *The Law of Municipal Corporations* (3d. ed 2004, rev. vol. 2022) (hereinafter "McQuillin")

---

[17] The issue of whether the Commissioners could determine the validity of the purported petition by "oral motion" was an issue that was raised sua sponte by the circuit court. Before us, no party has argued that more formal action is required.

23

§ 15:2 ("Whenever the controlling law directs the legislative body to do a particular thing in a certain manner the thing must be done in that manner.").

In several prior cases, we held that state law required the municipal legislative body to undertake the governmental action in question by the adoption of an ordinance. *See, e.g.*, *Hovnanian*, 472 Md. at 306 (holding that the city's adoption of a "recoupment agreement"—consisting of the imposition and collection of fees—was ultra vires and unenforceable against the city because it was not adopted by the legislative body by ordinance as required under the Maryland Constitution and state law); *Twigg*, 396 Md. at 543 (holding that a city mayor lacked the authority to create special assessment fees on behalf of the city and to waive impact fees because the General Assembly conferred the authority to levy fees and charges in the legislative body of the municipality, which was required to be undertaken by adopting an ordinance); *Inlet Assocs.*, 313 Md. at 433–34 (holding that former Article 23A § 2(b)(24) and the applicable provisions of the municipal charter required that the city adopt an ordinance to undertake a "swap" of public property for public amenities and that "a simple resolution, neither reduced to writing nor journalized as required by [the charter]," could not suffice to validate the city's actions).

The basis of our holdings in these cases is that the nature of the government actions at the center of the disputes—conveying public property, waiving impact fees, and levying and collecting fees—were all required to be undertaken by adoption of an ordinance under state law. That is not the case here. The governmental action in the instant matter involves a determination by the Commissioners as to whether a document presented to it constituted a valid petition for referendum under the provisions of the Charter. As discussed above,

24

the Legislature has placed municipal petitions for referendum on zoning matters squarely and exclusively within the purview of the municipal charter. For this reason, the Charter is the only place we need to look to determine how the Commissioners were required to make their decision.

Turning to the Charter, it does not require the Commissioners to consider the validity of a referendum petition in a particular manner. Article III of the Charter sets forth general provisions pertaining to the Commissioners. The Commissioners are authorized to "to determine [their] own rules and order of business." Charter § 306. They are required to "keep minutes of [their] regularly scheduled proceedings and enter therein the results of the votes taken upon each action, question, resolution, or ordinance," and the "minutes shall be open to public inspection." *Id.*

Furthermore, the Charter authorizes the Commissioners to adopt both ordinances and resolutions.[18] Section 401 specifies the types of government actions that require an ordinance in order to be effective. The Commissioners' determination of the validity of a petition for referendum does not fall within any of the categories of government action that require an ordinance under the Charter.

The Charter includes a definition of "resolution," which is consistent with the common law definition. *Compare* Charter § 308(a)(1) (defining "resolution" as "a law, a

---

[18] Section 308(b)(1) of the Charter states that: "[i]n order to enable the . . . Commissioners to fully exercise the power conferred upon [them] by this Charter and to enable [them] to better promote and preserve the public health, safety, and welfare, the . . . Commissioners may pass all ordinances and resolutions that are from time to time necessary[.]"

municipal regulation, *a formal expression of opinions, will or intent adopted by vote of the . . . Commissioners*" (emphasis added)), *with* McQuillin § 15:2 (stating that "a resolution, generally speaking, is simply an expression of opinion or mind or policy concerning some particular item of business coming within the legislative body's official cognizance" and that it "ordinarily denotes something less solemn or formal than, or not rising to the dignity of, an ordinance").

By contrast, the Charter defines "ordinance" as "a law adopted by the Board of Commissioners after advertisement and public hearing as hereafter set forth in this section." Charter § 308(a)(2). This definition is also consistent with the common law definition. *See* McQuillin § 15:2 (explaining that the term "ordinance means something more than a mere verbal motion or resolution, adopted, subsequently reduced to writing, and entered on the minutes and made a part of the record of the acting body." It is "a local law which is adopted with all the legal formality of a statute[.]").

"The general rule is that where a charter commits the decision of a matter to the council or legislative body alone, and is silent as to the mode of its exercise, the decision may be evidenced by resolution." *Id.* § 15:6. Moreover, "[a]ny official action, though not in form a resolution, may be one in legal effect." *Id.* Indeed, "a resolution, particularly when used to express a ministerial act, need not partake of any definite form and need not be a written instrument." *Id.* "It has been held that a motion taking the form of a resolution is equivalent to a resolution, and it also has been observed that there is no distinction between a resolution and a motion." *Id.*

Applying these principles here, the Charter authorizes the Commissioners to pass resolutions and ordinances and does not require that they act pursuant to an ordinance in this instance. It is undisputed that the Commissioners, as the legislative body of the Town, are charged with determining whether a petition for referendum complies with the requirements of the Charter (except for verification of signatures). Such a determination may be made by a verbal motion that is memorialized in the minutes and made part of the record of their official proceedings. The motion made here was the equivalent of a resolution, in that it constituted the "formal expression" of the Commissioners' opinion and was "adopted by vote" of the Commissioners and memorialized in the minutes of the proceeding. No further procedure or solemnity was necessary to memorialize this particular action.

Having correctly determined that the purported petition did not meet the requirements of the Charter, the Commissioners were not required to submit it to the Election Board for verification of signatures. Accordingly, Bodt is not entitled to a writ of mandamus or the permanent injunctive relief sought in the amended complaint.

**IV**

**Conclusion**

For the reasons set forth above, we hold as follows:

1. The legal sufficiency of Bodt's purported petition for referendum of a Town ordinance related to a comprehensive rezoning is a matter that arises solely under the Charter.

27

2.  Under the plain and unambiguous language of the Charter, the Commissioners had the authority to make the threshold determination of whether the text of the purported petition satisfied the requirements of the Charter prior to sending it to the Election Board for verification of signatures.

3.  The Commissioners did not err in determining that the purported petition did not satisfy the requirements of the Charter and was therefore invalid.

4.  Under the provisions of the Charter, the Commissioners were authorized to make the determination that the purported petition was insufficient by a verbal motion adopted by a vote of the Commissioners and memorialized in the minutes of the Commissioners' proceedings.

5.  Given that the text of the purported petition did not meet the requirements of the Charter, the Commissioners were not required to submit it to the Election Board for verification of signatures.  Accordingly, Bodt is not entitled to a writ of mandamus or the permanent injunctive relief sought in the amended complaint.

**JUDGMENT OF THE CIRCUIT COURT VACATED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS FOR THE ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**

28

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/27a23cn.pdf